SUSIE F. WILLIAMS *v.* SOUTHERN RAILWAY COMPANY.

(Filed 24 May, 1911.)

**1. Carriers of Passengers—Acceptance of Baggage—Notice.**

To fix the responsibility for lost baggage upon a railroad company, either as a common carrier or warehouseman, a delivery, actual or constructive, including an acceptance by the company, is necessary; and in order to a valid delivery the general rule is that when baggage is taken by others to the station, and to places where baggage is usually received, some kind of notice must be given to the agent authorized to receive it.

**2. Same—Custom—Modification of Rule.**

The requisites of the general rule to affect delivery of baggage of a passenger to a railroad company in order to hold the company liable may become modified by a custom of the latter to consider and treat baggage as received when left at a given place, without further notice.

### 3. Same—Apparent Agency.

To establish liability by a railroad company for the loss of a passenger's trunk, there was evidence on plaintiff's part tending to show that she had sent her trunk to defendant's depot by a drayman who, in the absence of the regular baggage man, placed it under the direction of one who apparently had charge at the time, where trunks were usually accepted; that the one giving directions for placing the trunk had on regular citizen's clothes, with the exception that the vest had brass buttons on it like those of defendant's conductors or employees, and that he went where the baggage men usually went, and appeared to be acting as a baggage agent for defendant; that plaintiff did not find her trunk, and after some conversation with defendant's acknowledged baggage agent the latter agreed to send her trunk on a following train and gave her a check for it. *Held,* (1) Error of the trial court to refuse plaintiff's prayer for special instruction, that if the trunk was left by the drayman at the time and place where baggage was received, in charge of the baggage man, or in *care* of *any one* whom *defendant* held out to the public to be in charge of the baggage room, such would be sufficient delivery; and, further, *held,* error (2) to a modification of the special instruction that in order to a valid delivery the trunk should have been left at the time and place with the knowledge and consent of defendant's baggage man or other *authorized agent* of the defendant company.

### 4. Same—"Agency by Estoppel."

When a railroad company by its acts has left a person in its baggage room apparently in charge of the baggage, notice given to him of the delivery of a trunk of a passenger is notice and may amount to an acceptance by the company, under the principle of "agency by estoppel," and render the company liable in damages for the loss of the trunk.

### 5. Issues—Discretion of Court.

The framing of issues is a matter which is left very largely in the discretion of the trial judge, the limitation being that the issues must be sufficiently responsive to the pleadings and determinative of the rights of the parties involved therein.

### 6. Issues — Carriers of Passengers — Immediate Transportation — Definition—Surrounding Circumstances—"Reasonable Time."

The plaintiff, on Sunday afternoon, having purchased a ticket over defendant's railroad, sent her trunk to the depot to be received and transported by it as baggage, intending to take her train to destination on Monday morning following. There was evidence tending to show the acceptance of the trunk as baggage

on Sunday afternoon, and of the custom of the railroad company to receive baggage to be transported in accordance with plaintiff's intent. In an action for damages for the loss of the trunk, *held*, it was proper to submit the issue, "Was said trunk received by defendant for immediate transportation?" but thereon the jury should be instructed that the meaning of the word "immediate" in this connection was "reasonable time," having due regard to the nature and circumstances of the case.

7. Carriers of Passengers—Baggage—Liability as Common Carrier—Acceptance—Reasonable Time.

In order to fix a railroad company responsible for baggage as a common carrier, the same must be delivered by the passenger and accepted for transportation within a reasonable time before he takes his intended train.

8. Same—"Custom"—Warehouseman—Questions for Jury.

When, in accordance with a custom of the carrier, it accepts baggage one afternoon for a train leaving the following morning, which the passenger intended to and did take to her destination, in the absence of some reasonable regulations restrictive of the company's duty, the company would be liable, in case of loss of the baggage, as a common carrier, and held as an insurer. In the absence of such custom, the liability of the company would only be for ordinary care as a bailee for hire; and on conflicting evidence as to the custom, the question would be for the jury to determine under proper instructions.

9. Carriers of Passengers — Baggage — Liability as Carriers — As Warehouseman—Legal Excuse—Burden of Proof.

When a railroad company accepts a trunk of its passenger for transportation, on failure to deliver it it is held responsible as a common carrier or warehouseman, with the burden on the carrier, in an action for damages, to render legal excuse for the failure.

APPEAL from *Long, J.,* at the October Term, 1910, of MECK-LENBURG.

Civil action to recover value of plaintiff's trunk and its contents.

There was evidence on part of plaintiff tending to show that on or about 30 August, 1908, on Sunday afternoon, at Charlotte, N. C., plaintiff, having purchased a ticket over defendant's road via Statesville, N. C., sent her trunk to the station of

defendant company in Charlotte to be received as baggage for transportation over defendant's road, plaintiff intending to take the train leaving Charlotte on Monday morning following, 31 August. The trunk was first given in custody to Robert Ramsaur, a drayman working for the Black Transfer Company, at the house where plaintiff was then staying, with directions to take same to the station for the purpose indicated, and no check or receipt for same was given by Ramsaur, that not being the custom; that the trunk was taken to the station, as directed, the defendant company duly notified, and same was left at the accustomed place, and, by direction of an agent of defendant company, in apparent charge of the baggage-room and baggage business at the station. Plaintiff went to station Monday morning for purpose of taking train and to baggage-room to check her trunk, and she and the baggage agent walked immediately to a new steamer trunk and check was placed on same and duplicate given plaintiff. As this was handed plaintiff the agent asked her if she was positive that it was hers, and witness said: "No, I am not positive; I borrowed the trunk from Mrs. Hook." He said, "Is there a name on it?" I looked over the trunk and found no name on it. Then he said, "Well, just open the trunk and see if it is yours." I took my key and opened the trunk, and it contained a gentleman's clothes. He said, "This won't do, it can't be yours." And of course I knew it was not mine, and I said, "What will I do? I am going to Blowing Rock and will need my clothes." And he said, "I will send your trunk to you just as soon as it comes." I said, "Suppose this is not my trunk that you send to Blowing Rock to me, what will I do; I will need my clothes?" I said, "If my trunk is lost what will I do?" And he said they very rarely lost a trunk. He said, "If a gentleman has your trunk, he will send it back here, and I remember distinctly shipping a new steamer trunk Sunday afternoon." He said there was an overflow of baggage from the flood, and he said, "Where are you going?" And I told him I was going to Green Park Hotel, Blowing Rock, and he gave me a check and I put it in my purse. When I took the train I had the check given me by Mr. Harrill. I went to Blowing Rock. I have not

received the trunk or the contents or the value thereof from the
Southern Railway Company. I made a list of the contents
about ten days after my trunk was lost.

There was evidence offered, also, tending to show that the
trunk was left at the place where unchecked baggage for trans-
portation was usually placed, a covered archway, between the
baggage-room proper and Gresham's dining-room, in the main
station building, and that it was not customary to receive bag-
gage for transportation on Sunday afternoon for trains leaving
Monday morning from station. It was proven or admitted that
neither the trunk nor its contents had ever been restored to plain-
tiff and that the check given by the company for same had been
destroyed or lost. Percy Shaw, the agent of defendant com-
pany, having charge of baggage-room and business concerning
baggage at the Charlotte station and attending to same, usually
in the day time, and J. H. Harrill, his assistant, having like
charge usually at night, were examined for defendant company,
and on matters more directly relevant to the questions presented,
testified that the trunk claimed by plaintiff was never delivered
to them at the time nor for the purpose stated, either by Ram-
saur or any other person. Percy Shaw, as witness, speaking
especially to this question, testified: "I live in Charlotte. I am
baggage agent at the Southern depot. Yes, I was baggage agent
in August, 1908. I went on duty at 7 A. M. and left at 7 P. M.
I was succeeded at night by Mr. Harrill. No one else there had
authority to receive trunks. No, I did not at any time receive
a trunk belonging to Miss Susie Williams. No, on 30 August I
did not leave any employee there at the baggage-room, with a
blue vest on, with brass buttons, to take my place. Conductors
running on the train are the only employees on. the Southern
road who wear such a uniform. (Cross-examination of Percy
Shaw.) On 30 August I came on duty at 7 A. M., I suppose. I
can't remember whether I came exactly at 7 o'clock or not. No,
I did not leave any conductor in my place that day. No, I did
not leave any one in my place that day." J. H. Harrill testified
to like effect, and gave evidence tending to contradict plaintiff's
account of the circumstances under which he gave the check. On
the question of whether the trunk was actually delivered to de-

fendant company by Robert Ramsaur, he testified as follows:
"I live at 810 E. First street, Charlotte. I work on transfer
wagon. Yes, I know Miss Susie Williams. Yes, on or about 30
August, 1908, I took her trunk from Mrs. Hook's house, 305
East Morehead street, to Southern Railway station. I took the
trunk to the Southern station and asked some railroad man
there. No, I don't know who I was talking to. It was a man
in the baggage room. No, I don't know who the man was I had
the talk with. He was a tall, slim-looking man. No, I don't
think he had charge of the baggage room there. Yes, I know
Mr. Percy Shaw."

Q. What took place between you and a man in the baggage
room?

I asked him could I set the trunk inside the baggage room.
He said, "No," to put it in the alleyway, where they put trunks.
I put it in the alleyway. There is a gate there now, but there
wasn't none there then. I have worked for Black about two
years in all.

Q. Did you know what the custom is about placing trunks
there for next morning's trains? Did you put that trunk there?
Yes.

Cross-examination of Robert Ramsaur: Yes, I have been haul-
ing trunks for about two years. Yes, I was working for the
Black Transfer Company at that time. Yes, Black sent me to
Miss Williams' to get the trunk. No, I don't carry claim checks
for trunks. The transfer man at the depot has them. Yes, I
went there some time in the evening before sunset. Yes, I got
this trunk and loaded it on the wagon. Yes, I know Mr. Percy
Shaw. No, he was not the man I was talking to in the station—
in the baggage room there. Yes, Mr. Shaw was the baggage
master there. No, I did not see him there at that time. No,
I did not say anything to him. Yes, he was the baggage master.
Yes, he was the man who received the trunks at the station, if
you could find him when you took trunks there. Yes, this tall,
slim man was a white man. He was standing just beyond the
scales in the baggage room. I put the trunk in the passage way,
between the baggage room and Gresham's dining room. Gresham
has a dining room there.

WILLIAMS *v.* R. R.

Q. And wagons drive up next to the kitchen?

Yes, I first pulled the trunk inside the baggage room, and the man in the baggage room told me, "No," to put it back there where trunks belong. Yes, I put it back out there. No, I said nothing to any one about it. No, I did not tell whose trunk it was. If the baggage man had been there I would have told him.

And, being recalled, this witness testified further:

"The man I saw there in the baggage room had on citizens' clothes—all but his vest. He had on a railroad vest—a railroad porter or something's vest. When he told me to take the trunk out of the baggage room he walked out of the place where Mr. Shaw and them checked the baggage. I asked him if I could put it there, and he said, 'No,' to put it outside where the trunks belonged. He came from the office where Mr. Shaw stayed. He was doing business, and I asked him if I could put the trunk there, and he said, 'No.' I don't know whether anyone except the baggage agents come from there. Yes, the baggage room door was open when I went in there."

"Yes, he was doing the things what the baggage man does. When I seen him, he was coming out the gate, and he had got beyond the scales when I saw him. I seen him doing nothing."

Q. So, all you know is that you saw a man in there who had on a blue vest with brass buttons, with "Southern" marked on the buttons, and you asked him if you could put the trunk in there, and he said "No," to put it out there. Had you ever seen the man before?

I think I had seen him once before. I have never seen him since. No, it was not Mr. Percy Shaw, nor Mr. Harrill.

Q. State whether or not when you took trunks there to the station Mr. Shaw or Mr. Harrill was always there, or whether they got other people to stay in their places sometimes.

There were other men in there besides Mr. Harrill and Mr. Shaw. I have seen baggage agents on the Southern Railway in there, checking baggage.

A paper-writing, containing a written statement of this witness in direct contradiction of the principal portion of his testimony as to delivery of the trunk, was introduced by defendant.

The jury rendered the following verdict:

1. Did the defendant company receive the trunk of the plaintiff on Sunday evening, 30 August, 1908, as alleged in the complaint, as baggage for transportation?  Answer: No.

2. Was said trunk received by defendant company for immediate transportation?  Answer: No.

3. Was the trunk delivered by the defendant company to the plaintiff?  Answer: No.

4. What amount, if any, is plaintiff entitled to recover from defendant on account of the alleged loss of said trunk?  Answer: Nothing.

Judgment for defendant, and plaintiff excepted and appealed.

*E. R. Preston and Neill R. Graham for plaintiff.*
*W. B. Rodman for defendant.*

HOKE, J., after stating the case.  To fix the responsibility for lost baggage on a railroad company, either as common carrier or warehouseman, there must have been a delivery of same, including an acceptance by the company, either actual or constructive; and in order to a valid delivery, the general rule is that when baggage is taken by others to a railroad station, and even to the place where baggage is usually received, some kind of notice must be given to some agent of the company authorized to accept the same.  Hutchinson on Carriers, sec. 105; Fetter on Carriers, sec. 610; *R. R. v. Beckley,* 119 Tenn., 528; *Gregory v. Webb,* 89 S. W., 1109 (40 Tex. Civ. App., p. 360); *Wright v. Caldwell,* 3 Mich., p. 51; *Merriam v. R. R.,* 20 Conn., 354; *Transfer Co. v. Gurley,* 107 Ala., p. 600.  This rule is at times modified where a custom of a company is established to consider and treat baggage as received when left at a given place and without further notice.  Fetter on Carriers, *supra; Green v. R. R.,* 41 Iowa, 410; *Green v. R. R.,* 38 Iowa, 100; *R. R. v. Foster,* 104 Ind., 293.  There is no objection open to plaintiff, by reason of his Honor's charge on the last position, for it was dealt with as plaintiff requested; but in reference to the first, plaintiff, admitting that his Honor stated the rule in general terms sufficiently correct, insists that there was reversible error committed, to his prejudice, in so modifying a prayer for instructions, on the first issue, as to exclude from consideration a

view in his favor properly arising on the evidence, and this in especial reference to the testimony of the witness, Robert Ramsaur, and corroborative facts tending to show a delivery of the baggage at the proper place and notice duly given. As heretofore shown, Robert Ramsaur, in effect, testified that, having charge of the trunk, he took it to the passenger station on Sunday afternoon and to the baggage room, and asked a man in there if he could put it in the room, and the man replied, "No, put it in the alleyway where they put the trunks," and witness then placed the trunk as directed. The man was a white man in citizens' clothes, except that he had on a railroad company vest; that he was the only man there in the office. Recalled on this point, the witness testified further: "When he told me to take the trunk out of the baggage room, he walked out of the place where Mr. Shaw and them checked baggage. He came from the office where Mr. Shaw stayed. He was doing business, and I asked him if I could put the trunk in there, and he said 'No.' He was doing things what the baggage men does." The witness further said that he had seen this same man once before, and that there were at times other men in there besides Mr. Shaw and Mr. Harrill, and the witness had seen baggage agents on the Southern Railway in there, checking baggage. On the part of the defendant, Mr. Shaw and Mr. Harrill testified that they had charge and control of the baggage room, and that neither of them had received the trunk claimed by plaintiff, nor had they authorized the man referred to by the witness, Ramsaur, nor any other man, to receive it or to accept notice concerning it. The witness, Shaw, however, stated that he was at times temporarily out of the office. In view of this testimony and supporting facts on either side, the plaintiff requested the court to charge the jury: "That if it was the custom of railroad companies to receive baggage Sunday afternoon or evening before for transportation on the next morning train, and that trunks or baggage should be left at defendant's passenger station at such times in care of the baggage man in charge of defendant's baggage room, or of any agent or servant of the company in charge of defendant's baggage room, or in care of *anyone* whom the company *held out to the public to be in charge of the baggage*

*room,* and should the jury find that the trunk, having been put in charge of the drayman for the purpose, was left by him at defendant's baggage room or in what was known as the baggage alley, with the knowledge and consent of the agent or servant in charge of defendant's baggage room, as aforesaid, then in any of those events, the court instructs the jury, the compliance with such a custom, existing at the time, by the transfer man, with the knowledge and consent of the defendant's baggage man or other agent of the defendant, as aforesaid, would be an acceptance of plaintiff's trunk, and such acceptance would be a delivery of plaintiff's trunk to defendant." The court gave the prayer generally as requested, but modified same by saying that if the plaintiff's trunk was left at defendant's station at the customary time and place, with the knowledge and consent of defendant's baggage man or other *authorized* agent of the company, etc. The case further states that the jury, having received the charge in the forenoon of Wednesday, 5 October, 1910, considered the case, and on Thursday morning stated they had been unable to agree on what was a legal delivery of the trunk, and, at their request and without objection, the typewritten instructions of the court were given them. The jury, having further considered the case until Friday morning, again came into court, when his Honor gave them further charge on the question of delivery, as follows: "As I understand you, you say you are troubled as to what constitutes an agent at the depot of the defendant to receive baggage. The defendant is a corporation. The defendant, therefore, conducts its business through and by its employees or agents. As the plaintiff in this case has alleged that she caused her trunk to be delivered to the defendant company, it is necessary for her to offer evidence that satisfies the jury, by the greater weight of the evidence, that some person authorized by the defendant corporation to act for it was acting for it at the time that she alleges that she delivered her trunk, or caused it to be delivered through her agent. Nothing short of a fair delivery of the baggage to the carrier or its agent will render the carrier liable for a non-delivery. That is to say, the plaintiff in this case, upon all of the evidence, must satisfy the jury, by the greater weight of it, that the trunk was delivered to some

person authorized to act for the defendant company as baggage
to be transported over the defendant's line as such, and the agent
of the defendant company must have received the baggage,"
plaintiff duly excepting to the modification of this prayer and
to the additional charge as *given*.  In thus modifying plaintiff's
prayer for instructions, and more emphatically in the additional
charge as given, the court intended to and did withdraw from
the jury the view arising on the testimony that if the baggage
was placed at the customary time and place with the assent and
knowledge of "one held out by the company as being in charge
of its baggage room," there was a proper delivery to the com-
pany, and in this we think there was reversible error, to plain-
tiff's prejudice, which entitles her to a new trial of the issue.
True, the witness, Ramsaur, testified that he knew both Percy
Shaw and J. H. Harrill, and knew also that they were the bag-
gage agents at defendant's station, but a perusal of the entire
testimony of this witness presents a permissible interpretation
for the consideration of the jury, that, while he knew Shaw and
Harrill were the company's agents in general charge and control
of the baggage business, yet the man he found in sole occupation
of the baggage room when he asked to place the trunk in the
room was the company's agent, then in charge, for the time
being, and, if not so in fact, he was allowed by defendant com-
pany to hold himself out as such, and for that reason a notice
to him may have been sufficient evidence of delivery.  This
agency, by allowing one to appear as such, or agency by estoppel,
as it is usually termed, has an important place in this branch of
the law.  It is very well stated in Clark and Skyles on the Law
of Agency, sec. 55, p. 140, as follows: "It is a well-established
doctrine that if a person by his words or conduct expressly or
impliedly represents to another that a certain state of facts
exists, and thereby induces the other to act in reliance on such
representation, he will be estopped to deny the truth of the rep-
resentation to the other's prejudice.  And by the application of
this doctrine, an agency may be created or arise by estoppel,
irrespective of the actual intention, and even though it may be
conceded that there was no agency in fact.  The general rule is
this: If a person knowingly permits another to act for him in

a particular transaction, or otherwise clothes him, either inten-
tionally or by negligence, with apparent authority to act for
him therein, he will be estopped to deny the agency as against
third persons who, in good faith and in the exercise of reason-
able prudence, deal with the apparent agent in the belief that
his apparent authority is real." Tiffany on Agency is to like
effect, and innumerable decisions here and elsewhere recognize
and apply the principle. *Gooding v. Moore,* 150 N. C., p. 195;
*Bank v. Hay,* 143 N. C., p. 326; *Morrow v. R. R.,* 134 N. C., pp.
92-96; *Harrell v. R. R.,* 106 N. C., p. 258; *Ouimit v. Hinshaw,*
35 Vermont, p. 605; *Minter v. R. R.,* 41 Mo., p. 503; *Battle v.
R. R.,* 70 S. C., p. 329; *Rodgers v. R. R.,* 2 Lans., p. 269, N. Y.
Supreme Court; affirmed 56 N. Y., p. ___; *Ins. Co v. R. R.,* 144
N. Y., p. 200. Some of these decisions, and many others could
be cited, were on facts very similar to those presented here, mak-
ing them apt authorities in support of plaintiff's position as
embodied in his prayer. In *Morrow's case,* on a question whether
defendant company knew that one had entered its trains for the
purpose of assisting a passenger, the fact that an employee of the
company was standing near, in a position to observe and note
the circumstances, was held evidence from which knowledge on
the part of the company could be inferred. *Associate Justice
Walker,* speaking for the Court, said: "Whether the person who
stood near the steps of the coach was the conductor or some
other employee, charged in law or fact with the duty of pro-
viding for plaintiff's safety, while exercising the lawful right of
assisting the company's passengers, is a proper subject of inquiry
for the jury," etc. In *Battle's case, supra,* it was held: "That
delivery of baggage to the only person in charge of the station,
who is at the time engaged as a telegraph agent, depositing it
at a place indicated by him, description of trunk and directions
as to checking, and that owner would soon appear and attend to
it, is delivery to the carrier." In *Ouimit's case, supra,* it was
held that a passenger has a right to regard as agent of a railroad
company a person who handles and takes charge of baggage upon
arrival of train at a station, and notice to such person by a pas-
senger is notice to the company." And in the case of *Rodgers v.
R. R.* it was held as follows: "The owner of a trunk sent it to

the defendant's depot by an expressman, who placed it within the depot beside the baggage crate, which was locked, and upon inquiring of persons there engaged in handling freight, was referred to the ticket agent as the person who took charge of baggage; he went to the ticket agent's office and told him that there was a trunk outside; the agent said that it was right, and immediately sent two men to take care of it. When the owner inquired for the trunk on purchasing his ticket later in the day, it could not be found, though the ticket agent said he had seen one a short time before answering to its description. Employees of the defendant also said that it had been delivered upon presentation of a check. In an action to recover the value of the trunk and its contents, *held,* that there was sufficient evidence of delivery, and a nonsuit was wrong."

Stating the proposition in a negative way in 6 Cyc., p. 671, it is said: "But the carrier will not be liable for the acts of its servants not authorized *nor held out* as authorized to receive baggage." On authority, therefore, the plaintiff was entitled to have this latter view presented to the jury, and to have his prayer for instruction given substantially as requested.

Plaintiff excepted further that the court submitted the second issue as to the receipt of the trunk for *immediate transportation.* We have frequently held that the framing of issues is a matter which is left very largely in the discretion of the trial judge, the limitation being that the issues must be sufficiently responsive to the pleading and determinative of the rights of the parties involved therein. And the statement is not infrequently made in the books that in order to charge transportation companies as common carriers, making them liable as carriers, the goods or baggage must be left with them for "immediate" transportation. If it becomes necessary, therefore, in order to make full determination of the rights of these litigants, that decision should be made whether this trunk was received and held as common carrier or warehouseman, it is well enough to submit the issue as framed. If this is done, however, the jury should be instructed that the term "immediate," in this connection, does not have its more usual meaning of "instantly, forthwith, nothing intervening either as to place, time or action," given in 4 Words

and Phrases, p. 3393, as Worcester's definition, but it means, rather, "reasonable time," having due regard to "the nature and circumstances of the case," cited in Words and ˇPhrases as Bourer's definition. The controlling idea being that in order to fix upon a company responsibility for baggage, as a common carrier, the same must be delivered by the passenger and accepted for transportation within a reasonable time before taking his intended train.     There is a decision (*Goodbar v. R. R. Co.,* 53 Mo. App., p. 434) which tends to hold that this must be the next train, but we doubt if this is a correct statement of the general rule, and certainly not where a custom is established on the part of the company to accept baggage for transportation on a subsequent or later train.   The true rule, we think, is very fully stated by Messrs. Elliott in their valuable work on Railroads, 2d Ed., sec. 1651, as follows: "The liability of the company as a common carrier begins, as a rule, at the time the baggage is delivered to it for transportation, unless the time of such delivery be an unreasonable length of time before the owner's intended departure.   In order that the liability as a common carrier should exist, it is not always necessary that the passenger should have purchased a ticket, nor that he should even make the journey which he intends to make.   As persons often become entitled to the rights of passengers before the purchase of a ticket, so the liability of a carrier for baggage sometimes begins before the purchase of a ticket, or even before the company becomes liable to the owner of the baggage as a passenger.   Where a person in good faith intends to take passage on a railway train, or the like, and delivers his baggage to the company a reasonable time in advance of the anticipated journey, it seems that the company will be liable for such baggage as a common carrier from the time of such delivery and acceptance.   And in such cases the company may be liable, although the person does not purchase a ticket or make the proposed journey, as, for instance, where he is prevented from so doing by the fault of the carrier and the loss or destruction of the baggage before the journey begins," and well-considered decisions are in support of the statement. *Hickock v. R. R.,* 31 Conn., 281; *Mfg. Co. v. Ullman,*

89 Ill., 244; *Lake Shore v. Mich. R. R.,* 104 Ind., 293; *Ins. Co. v. R. R.,* 144 N. Y., 200; *Woods v. Devin,* 13 Ill., 747. And, as relevant to the question more directly involved in this position, the case of *Hickock v. R. R., supra,* holds as follows: "A railroad company is presumed to receive baggage for transportation and not for storage, and its liability commences as soon as the baggage is delivered to and is received by the agent, notwithstanding the fact that it was not checked at the time it was received and would not be for several hours, nor until fifteen minutes before the train started, and that the passenger was so informed.

"2. Delivery or non-delivery of check for baggage is of no importance as affecting the liability of the carrier, it being merely in the nature of a receipt and intended as evidence of the ownership and identity of the baggage, and this is the rule generally obtaining in the absence of some specific and reasonable regulation restrictive of its liability."

As the cause goes back for a new hearing, we consider it well to advert to another exception insisted on for plaintiff, that his Honor charged the jury, as requested by defendant, as follows: "If the jury find from the evidence that the plaintiff, Susie E. Williams, purchased a ticket over the defendant's line from Charlotte to Statesville, on Saturday morning, and on the following Sunday evening sent a trunk to the depot, giving no instructions for shipment and no instructions for it to be checked, and did not intend for the same to be checked until the following morning, then the company, even if it received the trunk for storage, was merely a gratuitous bailee and liable only for its gross negligence. There being no evidence that the trunk was lost by the gross negligence of the defendant company, the jury will answer the fourth issue, 'Nothing.' "

As heretofore stated, if the trunk was delivered and accepted by the company in the afternoon for transportation on the following morning, and it was customary to receive baggage for transportation in that way, in the absence of some reasonable regulations restrictive of the company's liability they would take as common carriers and could be held as insurers in case the trunk is lost; but if no such custom existed and the trunk was

only received for storage for one intending to become a passenger, and until he claims the trunk and has the same checked, in such case the company is ordinarily regarded as bailee for hire and is responsible for ordinary care. It is the same rule of responsibility obtaining where baggage reaches its destination and is not called for in a reasonable time. After such time the carrier holds the baggage as warehouseman and is responsible for lack of ordinary care. Elliott on Railroads, secs. 1463-1533. In making this charge, the court was no doubt influenced to some extent by expressions in the opinion in *Kindley v. R. R.,* 151 N. C., p. 207, to the effect that in certain aspects of that case the defendant company was a gratuitous bailee, and as such responsible only for gross negligence. But the statement of the law and expressions referred to must be considered and construed in reference to the facts presented and in view of the rights there involved. In *Kindley's case* a passenger took the train at Fayetteville, N. C., intending to go through to Charlotte, the route lying over the Atlantic Coast Line to Maxton and over the Seaboard from Maxton to Charlotte. At Maxton the passenger determined to return to Fayetteville and notified the Coast Line conductor of such intent, with a request that the baggage be also returned. The trunk was carried on to Charlotte and when it was returned to the owner, some time thereafter, it was found to have been entered and some of the contents stolen. The appeal involved only the liability of the second carrier, and the decision in *Kindley's case* was placed on the ground that the intended passenger had never become such in reference to the second or connecting carrier, and that nothing had ever been paid or tendered such carrier, either for carrying the passenger or storing the trunk, and in that view only was the second carrier considered and dealt with as gratuitous bailee. In *Kindley's case,* too, weight was given to the language of the statute bearing on the subject (section 2624), which makes carriers responsible "for baggage of passengers from whom they have received fare." The principle, however, does not apply to the facts presented here, in any aspect of them, for if it should be established under proper ruling that until the trunk was claimed and checked for baggage it was held for storage only and not

for immediate transportation, as heretofore explained, on authority, the company is chargeable as bailee for hire and responsible for ordinary *care*. If received and held, either as common carrier or warehouseman, on failure to deliver, the burden is on defendant to render legal excuse for the failure. In Fetter on Carriers, at p. 1557, it is said: "With respect to baggage in possession of a railroad company as warehouseman, evidence that it failed to deliver the property to the owner, when demanded, *prima facie,* establishes negligence and want of due care, and the onus of accounting for the default lies with the carrier." There is error, which entitles plaintiff to a new trial, and it is so ordered.

New Trial.